Mr. Green, you are reserved four minutes of your time for rebuttal. That is correct. Thank you. Whenever you are ready. My name is Robert Green. I am here representing the opponent, Mylan Pharmaceuticals, in this matter. I will address first the issue of obviousness in this case. The district court in judgment finding that the claims of the 663 patent are not invalid for obviousness is incorrect and should be reversed. The district court breached this decision first by starting with a rigid set of preventive rules that limited the obviousness inquiry and simply removed common sense in this case, all contrary to the Supreme Court's guiding principles as recently expressed in KSR. Let me ask you about that. You do argue that the district court required an express teaching, but assuming you may be right on that, can you cite us any testimony that indicates that there was a suggestion to make the substitution in either common knowledge or implicitly in the art? Dr. Wolf's testimony on behalf of Mylan directly dealt with that question. In fact, he said, I believe his phrase was a rose by any other name is still a rose. In other words, that one of skill in the art would recognize from the teachings of, in particular, Hertz Broussel that are cited many times throughout this litigation, that you can change, again to use chemistry, the keto group in the perineum to the benzyloxazole is something that one of ordinary skill in the art would derive from that information alone. The court faulted the Mylan position because Mylan did not rely on quote standard references for standard tests. And that is a clear indication that the court was applying a rigid, rigid law. One where the KSR court has found it to be absolutely incorrect. The KSR Supreme Court has found that one of ordinary skill in the art has creativity and can put pieces of prior art together like a jigsaw puzzle. This was not a complex jigsaw puzzle. The prior art was Jansen's own compound perineum peroneum. It was almost identical with the claimed compound below. The only difference was, again to use chemistry, this keto group is present in perineum peroneum. The benzyloxazole group is present in compound below. The question was, and go through the gram factors, the only difference between the prior compound and the claimed compound was that one difference. That difference is clearly shown in the Herxger cell references that are cited. It's clear on its face that it had been used in multiple instances and was also clear using one of Jansen's own molecules called benparadol where it existed in the prior art at the same structural location. It had a keto group. It was changed to a benzyloxazole like Herxger cell. The prior benparadol product was an antipsychotic. The product with the benzyloxazole as modified by Herxger cell was an antipsychotic. You're going to hear, I believe, from counsel for Jansen that it wasn't a good antipsychotic. The fact is it was tested and it was shown to be effective. There are a few classes of patients in which it wasn't effective, but that's true with any drug. It was effective as an antipsychotic and the references taught it to be an antipsychotic. But wasn't the ratio the important part? The ratio of the two aspects the critical part of the issue? You're referring to the ratio of the serotonin and dopamine. It is not a critical part of the invention. Let's put this in context. What are we talking about? We're talking about a claim in Jansen's patent to compound 11. Compound 11 is nothing more than a laboratory curiosity. Compound 11 is shown in the record to have no activity other than the activity shown in Jansen's patent using animal tests. That same standard when applied to parinperone as a starting compound shows exactly the same attributes that parinperone had dopamine activity, it had serotonin activity, it passed the test if you will that they told the patent examiner was predictive of utility in the field of antipsychotic testing. One of the major problems I have with the way the district court judge ruled on this case is that the standard that was applied to compound 11 at the patent office was reasonably minimal to get the patent for treating antipsychotic diseases. Counsel may make a comment. First of all, I thought that the district court judge really came forward with a thorough opinion, really worked hard to get it right and found against your client on at least four independent grounds. In going through the brief, I found it very difficult to cover some of the points made by Milan in the briefs because Milan would state a claim or make an assertion and then support the claim or assertion by reference to string sites. For example, on page 50, references to 10, 12 sites that reference publications in transcripts and I'm going through the transcripts and trying to find where one witness is testifying where that testimony ends and where another witness starts and I found it very difficult to follow along. I just would want to make that comment. I do have a question. I thought you raised a very good point in reference to the improperly compound standard and in your brief, you argue that the district court used an improperly compound standard by requiring Milan to justify the selection of parinperone as the lead compound in attacking the problem of schizophrenia, as I understand it. Since the briefs were written, we have KSR that has been issued by the Supreme Court and how has the lead compound argument placed in your brief been changed, if at all, in light of KSR? Prior to KSR, the lead compound standard as applied by the district court was wrong. It's now even more so. I believe the Supreme Court in the KSR decision has again clearly told this court that when dealing with an obvious inquiry, it's a fact specific inquiry that must have flexibility and rigid rules such as the lead compound standard fall right in that category of a rule which simply takes common sense out of the equation and I think that's aptly recognized by reading the district court's opinion where the district court applies the lead compound standard really in a manner that was not applied in any of the prior cases even dealing with the lead compound standard. Milan was faulted for not establishing that parinperone was the compound that a person of ordinary skill in the art would have selected when going forward to make modifications to derive a new antipsychotic. Is it one of many? He said we didn't prove that it was the compound. The court relied, I believe, on Yamanuchi to support the lead compound standard and let's assume for argument today that the court was wrong in that portion of the analysis and because of KSR there's even more error. Does it really matter in light of the other several grounds that the court found in favor of Jansen? Absolutely, Your Honor, because it's a bit of a cascade of faults with the district court opinion. The first is the lead compound standard which then cascaded into a series of other factual findings that are either clearly erroneous or simply not supported by the record. And I apologize, Your Honor, to any difficulty in understanding points of the brief. I'd certainly be more than happy to respond to a specific question. But let's turn first to the global issue which is really not a point of the findings that the court goes into dealing with the subsidiary categories. The first point, it's not a dispute, is that the only difference between parinperone and the benzazoxazole on the other. If you look at Perks-Purcell, that's not a dispute. Perks-Purcell shows compounds or antipsychotics that have at that very location the same group, the benzazoxazole, not in dispute. I submit you can stop right there. There's no need to go into any of those further findings by the district court to reach a conclusion of obviousness. Those findings were based upon the second argument which is not only is there motivation to make the change because Perks-Purcell simply says these are good antipsychotic molecules and modification at this point in the molecule to have a benzazoxazole group gives you a good antipsychotic. It's based on the argument that the keto group had a problem. And it did. The problem was it had a short half-life. Jansen argues there's no proof of that. Their own report admitted at the district court as evidence in the prior art is what they claim to be a predictive dog model. That predictive dog model said that Perone had a short half-life. The court's finding is the contrary. The court doesn't even reference that document in its finding. That's clearly erroneous. But was there any prior art which indicated a pair of Perone was being considered or should be considered as an antipsychotic drug? At that time, Your Honor, the answer is no. The fact is the antipsychotic activity of Perone was defined by the predictive dopamine test. Now that's the same test that Jansen used. But the court also found that the prior art showed that not all dopamine antagonists are effective antipsychotics too, right? There is prior art that shows that not all dopamine active compounds are antipsychotics. That's correct. This is a choice, though, isn't it? A determination? I mean, it's trial and error of trying to figure out exactly where to go with it. And it's hindsight? Twenty-twenty is always hindsight? Your Honor, I submit the answer is absolutely not. The fact is the reason why the art hadn't progressed any faster than it did with respect to Perone is it was originally a compound for treating anxiety due to its serotonin characteristics. Jansen later found out that it had properties as a dopamine antagonist. Now, the dopamine antagonism we're talking about is not some obscure dopamine antagonism. It's dopamine antagonism that was deemed to be potent, not just a little bit, but a potent dopamine antagonist by Jansen using the very same test that Jansen used to get the patent through for compound 11. That's not hindsight. That's fact. And that's by their own publications. And those publications were not in front of the examiner. And why did the examiner get it wrong? The examiner was never told that Perone had dopamine antagonism. In fact, when one of the other compounds relied upon what the patent examiner, catanserin, was cited as a prior art reference, a Jansen compound, and the examiner said, well, why can't you just change catanserin to make an anti-psychotic? They came back with an affidavit and said, it doesn't have dopamine antagonism. But I'm still not seeing it, Judge Gaillard's question. If the other side has shown that parenferone had no anti-psychotic activity, and that risperidone unexpectedly does, why isn't that enough to support the unexpected results conclusion so that even if you reach a prima facie case of obviousness, you lose on unexpected results? OK, Your Honor. I believe there are actually two questions there. The first is, was parenferone shown not to have anti-psychotic activity? Absolutely not. The judge found, based on three abstracts, that there was no anti-psychotic activity demonstrated. Not using the predictive dopamine test, by the way, that Jansen told the patent office was predictive, but rather three alleged other testings of parenferone in three abstracts. He found that parenferone failed the fentanyl discrimination test. And I submit, Your Honor, you should read the transcript on this. You should read the abstracts. You won't find the word fentanyl anyplace. There was no fentanyl discrimination test. But the judge found it because Jansen told the judge it was in there. It's not. It was indicated that parenferone failed the cocaine discrimination test. You read the three abstracts? There is no indication that parenferone was tested using that test. The third test, the food reenforcement test, the first abstract does indicate that at the tested level, there was no activity of parenferone. Two months later, Jansen published another abstract, the third abstract in the series. And the tone changed. It didn't say it had no activity. It said at that dosage level, it was less active than another compound, cetonaferone. It didn't say it had no activity. And there's an easy explanation for that. Activity is dose response. And the fact is, because of the high potency of parenferone used as a serotonin antagonist, and that was the level they were testing at, there was less response. But it doesn't say there was no response. And it does not say that parenferone was not an antipsychotic. In fact, if you look at the record here, you'll see that the two offices from Jansen actually indicated that parenferone had been tested as an antipsychotic. This is their testimony, including one inventor. And he said that it failed because of the bad half-life. Let me ask you one quick question before your time runs out. Under KSR, do you think motivation is a question of law or fact after KSR? It's a question of law. Thank you, Mr. Green. We'll restore three minutes of your rebuttal time. Thank you, Your Honor. Why don't you add three minutes of Mr. Dixon's time. Thank you. May it please the Court. I represent Jansen on this appeal. Risperdal is a breakthrough drug. It was the first of the safe second-generation antipsychotics. It could be administered that the mobility and motor effects of the first generation has been an overwhelming and important success in the medical community. Six generics recognized the validity of the patent by filing Paragraph 3 certifications. This case involves compound patents, compound claims, and method claims. That's correct. Should the analysis have been different for those different categories or not? I mean, the district court clearly just lumped it together, right? I think neither party suggested a different analysis. And I think on the facts of this case, the analysis was the same. The questioning was basically they had an obviousness case. And the obviousness case all centered about creation of the compound. So I think in this case, the issues basically merged. But more a compound than a method? Yeah, it was a compound case. Counsel has argued, now, as Judge Otero has pointed out, there was a lengthy opinion by Judge Liflin carefully analyzing all the facts. This court must find repeated errors of fact, repeated clearly erroneous findings before a reversal could be justified. And I don't think, respectfully, that Mylon has shown any errors in his arguments. Well, how do we place his opinion, which is very, very well done, through the spectrum of KSR now that we have KSR? I think that's pretty easy. KSR was very much on the horizon when this case was briefed and decided. Neither party urged rigid rules. Reading from a letter we wrote to Judge Liflin, Jansen's position has been the defendant's selection of Perumperon as the foundation for their obviousness analysis defies common sense. That was the argument we made. Judge Liflin began his analysis by citing the Alza decision of this court, which he recently issued and made it very clear that the obviousness analysis is one of flexibility. That's on page A18. And on page A25, he expressly recognized that evidence of a motivation to combine need not be found explicitly in the prior art. It may be implicit from the prior art as a whole. Judge Liflin decided this case, in our view, exactly as the KSR court would have wanted, exactly as the Alza court corrected. The district court applied the clear and convincing standard of invalidity. And in light of KSR's harsh criticism of that standard, should this case revisit that standard? I respectfully don't think so, Your Honor. And I don't read the KSR case to challenge the clear and convincing standard. I read it as endorsing the Alza approach to validity analysis, and basically a requirement there not be rigid rules, that common sense has an important place at the table. But this was a case that was all about common sense. I think there, in fact, are... Well, aside from the fact that we're all going to be using the words flexibility and common sense from now on, there's a problem with the lead compound analysis of the district court. At least that portion, right? I mean, I read KSR as really rejecting this notion that you force someone to a particular starting point, and I read the district court as having done exactly that. That might not be fatal. That's not fatal to your case. I'm not sure I agree with that analysis. I mean, KSR is a mechanical case talking about combining two mechanical ideas. Chemical cases are different. Chemical cases, the art is one in which scientists work with the compounds. And, in fact, I think the Henry Dillon case, I think, remains good law. It's a structural combination. You need a reason or a motivation to pick the compounds and put them together. And as Judge Lislin found, Yamanuchi's just a specific application of Dillon in the chemical arts. You need a reason. You've got a perepiron, you've got a benzoxyl group. Why are you going to combine them? Well, what's the reason to work with perepiron? And that's really what the question was. I think respectfully that that is pretty much the same analysis. I think in a chemical case, where the undisputed testimony from both sides was the chemists work by identifying lead compounds. That's just what one skill in the art does. Identify the lead compound, experiment with it, if modification is necessary, they modify it. So I think it really is a fact-specific application of thinking that is pretty much completely in accord, in my view, with KSR. Do you think the reason to combine is really a changed level of analysis? In the TMS type of a... I don't think... I think the standard, obviously, our buzzwords are flexible and common sense, but I think the idea is the same idea, that one must have a reason to go forward. And this is a very, I think, easy case, because the art, unlike KSR, where we're talking about predictable results, the art strongly taught against perepiron, strongly taught against it. There were three articles published by Dr. Jansen, who had also published in the same time period articles that said perepiron had an antidopamine effect. Three articles reporting that it was not an antipsychotic. These articles are in the record. Council has tried to glean what slivers he can from them, but they all involve cases where Dr. Jansen was testing three LSD antagonists, perepiron, centopiron, and another. And he wanted to see whether these LSD antagonists could also be antipsychotics. And he found, and reported in the literature, A1416, that centopiron uniquely, centopiron but not perepiron, combines pure LSD antagonism with neuroleptic activity. Centopiron's the only one that's a neuroleptic, an antipsychotic. That is the conclusion of all three of these articles. The other one, A1432, centopiron uniquely combines pure LSD antagonistic activity and typical neuroleptic effects. The third one has exactly the same conclusion, A1435. These were testified to by Dr. Herbert Nelson, one of the leaders in American research in antipsychotics. He explained what they meant. He explained the food discrimination test. It's also known as the fentanyl discrimination test. You can find his testimony at A8454-57. Powerful teaching away. One would not work with perepiron. And completely apart from that, the dominant theory of antipsychotics was you had to have an anticholinergic effect to be a second-generation antipsychotic. Perepiron didn't. It's not a question as counsel phrases it of a more desirable or less desirable. The dominant theory was if you didn't have an anticholinergic effect, it didn't work. So why would anyone work with perepiron? Whether you call it a lead compound analysis or a reason, common sense, this is an easy case. I think Judge Listman's opinion carefully analyzes these factors and leads you to that conclusion. The art taught away from perepiron. And then everything else was just a house of cards of arguments, all of which were rejected by Judge Listman on substantial evidence. I don't think any serious challenge would draw it on appeal to why one would reject his findings that three times a day dosing is okay for an antipsychotic. There are only two medical doctors who testified at trial. They both said that. If you wanted to preserve perepiron's supposed advantages and make it longer-lasting, you'd work with something that didn't change its structure, a long-lasting pill like Adipo, like a transdermal patch. If you wanted to change its structure that was risky and uncertain, their expert testified that he had only succeeded with chemical structural modification three or four times out of hundreds of attempts and he created a commercial product out of chemical modification. Was the testing all being done for anti-anxiety type of a testing at that point? Yes. Were there any tests at all for antipsychotic drugs? Perepiron was not considered an antipsychotic drug as counsels know. Before 1985. Before 1985, that's correct. After Dr. Melsker's work in 1989, in hindsight, suddenly people saw, oh, certain kinds of dopamine serotonin antagonists might work. Some of the hindsight work points to Perepiron but certainly nothing in the art as of the priority date points to Perepiron as a candidate and therefore was not tested as an antipsychotic. But, three times a day dosing, the medical testimony was the medical community would have leapt at an improved antipsychotic, three times a day dosing would have been an enormous success had all the market leader was a three times a day product and had awful side effects. If you wanted to modify it, why would it be a metabolism with a ketone problem? The evidence was that was not obvious based on substantial medicinal chemistry testimony from Dr. Abraham. If you wanted to... And that was the finding of the district court judge and you're saying that the finding was not clearly erroneous. Absolutely. After we know the evidence. Every one of these findings was an actual finding by the district court. Every one of them was not clearly erroneous. And indeed, every one of them was extremely well supported in the evidentiary record. But after KSR, do we have to look at... Do you think after KSR there's some suggestion that the motivation question at least is a question of law and not a question of fact? That will be for your court to decide. I would think it's not. I still think of this applying the grand factors as far as factual findings by the district court. Certainly, the ultimate determination of obviousness is a question of law that this court can decide to know about based on the underlying facts. Based on the facts as found by the fraud court or the jury. But what difference is there between a reason and combine and a teaching and combine? I think these are similar words. I think it's... But I don't see the... I think reason perhaps more encompasses the common sense flexibility idea. But the KSR court certainly wasn't throwing out the teaching suggestion motivation test. And indeed, I read it as essentially endorsing the test except arguing that it shouldn't be rigidly applied. And I think this is a classic example of a district court very diligently aware of the debate. Neither party asking for just looking at the art and explaining that he doesn't see any reason to make this change. Applying the grand analysis. Comparing the invention to the primary. I'm sorry, did you say it was a jury trial? No, no, no. Okay. The benzosoxazole substitution likewise was not fought in the yard. There was no final patient case. Secondary considerations had been addressed in the primary patient case were overwhelming. And I think I'll rest on my reasonable and equitable conduct unless panel has any questions. Thank you, Mr. Bisnick. Thank you. Do you have any questions? Mr. Green. You have three minutes. Let me first address the lead compound issue. The court found my line failed to demonstrate that the prior part would have motivated a person of ordinary skill in the art in 1985 to choose Perone as his or her lead compound. That's the finding of the court. How the judge couched the analysis before he got to the application, as counsel just referenced, I think is irrelevant. How he applied it is the question in front of this court. And that's how he applied it. He found that my line did not prove that one of skill in the art would choose Perone as his or her lead compound. The judge did not come back and find that there was no proof that this was one of many, as it should have been the standard. No, he found that we didn't prove that Ren Perone would have been chosen as his or her lead compound. With respect to the multitude of issues, again, I go back to the fact that the motivation to make this change comes strictly from the Herzberg teachings that show antipsychotic compounds that have the benzazoxazole in place of the keto group. Counsel says that these three abstracts teach that Ren Perone in fact was not an antipsychotic. Again, I urge you to read the abstracts. That is not in there. The language, it is concluded that cytoporone uniquely combines LSD antagonists and neuroleptic activity could be read that way, but more aptly read is in the context of the entire abstract, which says we're testing Ren Perone and cytoporone on one set of conditions. Under those conditions were both compounds had activity in suppressing LSD. Ren Perone was very active as a serotonin antagonist, which meant that the amount of serotonin activity caused the amount of Ren Perone that was being used to be small. So the fact that it had less activity than cytoporone is not surprising at all. And this court has said that it is absolutely improper to read a reference as a negative teaching unless it says that. This reference does not say, nor do any of the other two abstracts, that Ren Perone does not work as an antipsychotic. Again, the predictive test used to get the patent through on compound 11 in fact is the test that showed that Ren Perone was a potent dopamine antagonist. But you've got really four steps to go from Perone to You've got four clear steps that need to be taken. There's one step where it's changed the keto group to the benzodiazole. The physical chemistry as to how you make a replacement is irrelevant to the question of what does the structure look like at the end of the day. This isn't a method patent. This is a patent on the actual molecule. On the compound. And how you derive that compound isn't relevant. In fact, they don't have process claims. The actual structure is what's key here. And there's one difference. It's changing that keto group to a benzodiazole. If I could take a few seconds on the issue of secondary considerations. This court has always said that in order for a claim to have the benefit of secondary considerations, the scope of the showing must be commensurate with the scope of the claim. All claims in this patent cover at least two compounds. And in each and every case it covers compound 11. There is not one scintilla of evidence below that shows that there is anything other than its predicted activity. It has no commercial success. It was a laboratory curiosity. It never found its way into the clinic. It was never shown to not have extra-parameter side effects. It was never shown to have any qualifications once tested in here. That's all. Mr. Green, do you have any questions? No. Thank you. Thank you, Mr. Green.